SHEPHERD, FINKELMAN, MILLER
& SHAH, LLP
JAMES C. SHAH
475 White Horse Pike
Collingswood, NJ  08107
Telephone: 856/858-1770
Facsimile: 856/858-7012
Email: jshah@sfmslaw.com

[Additional Counsel on Signature Page]

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAWANDA LASHA HOUSE JOHNSON, Individually and as Representative of a Class of Similarly Situated Persons, and on Behalf of the PROFIT SHARING PLAN OF QUEST DIAGNOSTICS INCORPORATED,<br><br>Plaintiff,<br><br>vs.<br><br>QUEST DIAGNOSTICS INCORPORATED, PROFIT SHARING PLAN OF QUEST DIAGNOSTICS INCORPORATED BENEFITS ADMINISTRATION COMMITTEE, PROFIT SHARING PLAN OF QUEST DIAGNOSTICS INCORPORATED INVESTMENT COMMITTEE, and DOES NO.,1-20,<br><br>Defendants. | Civil Action No:<br><br>**DEMAND FOR JURY TRIAL**<br><br>**CLASS ACTION COMPLAINT** |

## <u>NATURE OF THE ACTION</u>

1.      Plaintiff, Lawanda Lasha House Johnson ("Plaintiff"), individually and on behalf

of all other similarly situated persons and the Profit Sharing Plan of Quest Diagnostics

Incorporated (the "Plan"), brings this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA").

2.      Plaintiff asserts her claims against Quest Diagnostics Incorporated ("Quest"), and the Profit Sharing Plan of Quest Diagnostics Incorporated Benefits Administration Committee ("Administrative Committee"), the Profit Sharing Plan of Quest Diagnostics Incorporated Investment Committee ("Investment Oversight Committee") (collectively "Committees"), and Does No. 1-20, who are currently unknown members of the Committees, (collectively, "Defendants").  The Administrative Committee, which, upon information and belief, is comprised of Quest officers and employees, was (and is) responsible for the administration, management, and operation of the Plan.  Likewise, the Investment Oversight Committee, which, upon information and belief, is comprised of Quest officers and employees, was (and is) responsible for selecting and monitoring the Plan's investments.  As fiduciaries to the Plan, both Committees (and their members) had a duty under ERISA to act prudently and solely in the best interest of the Plan and its participants and beneficiaries when selecting investments, products, and services for the Plan.

## PRELIMINARY STATEMENT

3.      Defined contribution plans that are qualified as tax-deferred vehicles under Section 401 of the Internal Revenue Code, 26 U.S.C. §§ 401(a) and (k) (i.e.  401(k) plans), have become the primary form of retirement savings in the United States and, as a result, America's *de facto* retirement system.  As of 2016, Americans had cumulatively invested over $7 trillion in assets in defined contribution plans like the Plan at issue here.  Unlike traditional defined benefit retirement plans, in which the employer typically promises a calculable benefit and assumes the risk with respect to high fees or under-performance of pension plan assets used to fund defined

benefits, 401(k) plans operate in a manner in which participants bear the risk of high fees and investment underperformance.

4.     The importance of defined contribution plans to the United States retirement system has become increasingly pronounced as employer-provided defined benefit plans have become increasingly rare as an offered and meaningful employee benefit.

5.     The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans.  In a defined benefit plan, the participant is typically entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized.  As a result, the employer bears all risks related to excessive fees and investment underperformance.  Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments.  But in a defined contribution plan, participants' benefits are limited to the value of their individual accounts, which is determined by the market performance of employee and employer contributions, minus investment expenses.  Thus, the employer has less incentive to keep costs low or to closely monitor the plan to ensure that selected investments are and remain prudent, because all risks caused by high fees and poorly performing investments are borne by the employee.

6.     The effect of such fiduciaries' imprudence on workers can be severe.  According to one study, the average working household with a defined contribution plan will lose $154,794 to fees and lost returns over a 40-year career.[1]  Simply put, a fiduciary's mismanagement of plan assets leading to an investment lineup filled with poor-performing investments and excessive fees can force a participant to work an extra five to six years to compensate for the excess fees that were paid.

---

[1] *See* Melanie Hicken, *Your employer may cost you $100k in retirement savings*, CNN Money (Jun 1, 2014), http://money.cnn.com/2013/03/27/retirement/401k-fees.

7.     The Plan is a "multiple employer" 401(k) plan, as set forth in Section 413 of the Internal Revenue Code, sponsored by Quest.  The Plan is established and maintained under a written document in accordance with 29 U.S.C. § 1102 (the "Plan Document").  In addition to Quest, four other employers appear to co-sponsor the Plan so that their eligible employees can participate in the Plan.

8.     With nearly $3.9 billion in assets as of December 31, 2018, the Plan is in the top 0.1% of all 401(k) plans in terms of assets.[2]  Additionally, as of December 31, 2018, there were nearly 56,000 participants in the Plan.  The marketplace for 401(k) retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.  Multi-billion dollar defined contribution plans, like the Plan, have significant bargaining power and the ability to demand low-cost administrative and investment management services within the marketplace for the administration of 401(k) plans and the investment of 401(k) assets.  As fiduciaries to the Plan, Defendants are obligated to act for the exclusive benefit of participants, invest the assets of the Plan in a prudent fashion and ensure that Plan expenses are fair and reasonable.  At all pertinent times, as explained below, Defendants: (a) were fiduciaries under ERISA; (b) breached their fiduciary duties under ERISA by failing to fully disclose to participants the expenses and risk of the Plan's investment options; (c) breached their fiduciary duties under ERISA by allowing unreasonable expenses to be charged to participants for administration of the Plan; and (d) breached their fiduciary duties under ERISA by selecting and retaining high-cost and poor-performing investments, instead of offering other readily available, easily identifiable and more prudent alternative investments.

---

[2]*See* The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2016 (pub. June 2019).

9.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiff

brings this class action under ERISA, and, in particular, under 29 U.S.C. §§ 1104, 1109 and

1132, for losses to the Plan caused by Defendants' breaches of fiduciary duty.  Based on this

conduct, Plaintiff asserts claims against the Defendants for: (a) breach of the fiduciary duties of

prudence and loyalty (Count I); (b) failure to monitor fiduciaries and co-fiduciary breaches

(Count II); and, in the alternative, (c) knowing breach of trust (Count III).

10.      Plaintiff brings this class action on behalf of the Plan and its participants[3] for

losses to the Plan caused by Defendants' conflicted and imprudent selection of investments and

services for the Plan.

11.      Plaintiff brings this class action on behalf of the Plan and all other similarly

situated current and former participants and beneficiaries under 29 U.S.C. §§ 1109 and 1132, to

recover the following relief:

- A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

- A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

- Equitable, legal or remedial relief for all losses and/or compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all the circumstances.

---

[3]As of December 31, 2018, there were approximately 56,000 Plan participants.

## JURISDICTION AND VENUE

12.     Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e), 29 U.S.C. § 1132(e).

14.     Venue is proper in this juridical district pursuant to 29 U.S.C. § 1132(e) because Quest's principal place of business is in this district.

## THE PARTIES

15.     Plaintiff is a former employee of Quest and current participant under 29 U.S.C. § 1002(7) of the Plan.  Plaintiff, a resident of Perris, California, worked for Quest until May, 2018 and maintains an account with the Plan.

16.     The Plan is an "employee pension benefit plan" within the meaning of 29 U.S.C. § 1002(2)(A) and a "defined contribution plan" within the meaning of 29 U.S.C. § 1002(34). The Plan is a qualified plan under 26 U.S.C. § 401 and is commonly referred to as a "401(k) plan."  Eligible employees, as defined in the Plan Document, may direct the investment of retirement assets into several select investment funds.  The available menu of investment options is curated by Defendants and, specifically, by the Investment Oversight Committee, as described in detail below.

17.     Quest is a corporation organized and existing under the laws of New Jersey, with its principal place of business in Secaucus, New Jersey.  Quest is identified in the Plan Document as the "plan sponsor" of the Plan under 29 U.S.C. § 1002(16)(B).  Quest is also a "named

fiduciary" under 29 U.S.C. § 1102(a)(2).  As the Plan sponsor, Quest is, by definition, also a party-in-interest of the Plan.

18.     The Administrative Committee is designated by the Plan Document to assist Quest with administration of the Plan.  The Administrative Committee is a "named fiduciary" of the Plan identified in the Plan Document pursuant to 29 U.S.C. §§ 1002, 1102.  The Administrative Committee exercises discretionary authority and control to administer, construe, and interpret the Plan and its assets.  Quest's Board of Directors appoints members of the Administrative Committee, with the only requirement being that the committee is composed of three or more employees.  The Administrative Committee is permitted to choose a chairman from its members and has the responsibility and discretion to control and manage the operation and administration of the Plan.

19.     The Investment Oversight Committee is designated by the Plan Document and established by the Administrative Committee to assist Quest with the selection of investment funds offered for selection by Plan participants.  The Investment Oversight Committee is a "named fiduciary" identified in the Plan Document pursuant to 29 U.S.C. § 1002, 1102(a).  The Investment Oversight Committee exercises authority or control in selecting and monitoring the Plan's assets.  The Investment Oversight Committee has "discretionary responsibility . . . with respect to the selection and monitoring of the Investment Options provided for Participant-directed investment pursuant to the Plan . . . and to make other investment-related discretionary decisions."

20.     Doe Defendants Nos. 1-20 are the members of the Committees.  The members of the Committees have been delegated fiduciary authority pursuant to the Plan Document. Plaintiff is currently unable to determine the membership of both Committees, despite reasonable

and diligent efforts, because it appears that the current membership of the Committees is not

provided to the public.  As such, the defendants are named Does 1-20 as placeholders.  Plaintiff

will move, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to amend this Complaint

to name the members of the Committees as defendants as soon as their identities are discovered.

## FACTUAL ALLEGATIONS

### A.    Background

21.    The Plan serves as a vehicle for retirement savings and to produce retirement

income for employees of Quest and the other co-sponsoring employers.  The Plan covers eligible

employees of Quest, its affiliates, and the other co-sponsoring employers as described in the Plan

Document.  As described above, Quest has delegated the administration of the Plan to the

Administrative Committee and the responsibility for selection of the Plan's investment options to

the Investment Oversight Committee.

22.    The Plan is a participant-directed multiple employer 401(k) plan in which

participants direct their retirement assets into a pre-selected menu of investment offerings

consisting of several types of investments.  The amount of retirement income generated by the

Plan depends upon contributions made on behalf of each employee by Quest, its affiliates, or the

other co-sponsoring employers, deferrals of employee compensation and employer matching

contributions, and from the performance of the Plan's investment options (net of fees and

expenses).

23.    The Plan has established a trust, which is managed by Fidelity Management Trust

Company, to hold participant and employer contributions and such other earnings, income and

appreciation from Plan investments, less payments made by the Plan's trustee, to carry out the

purposes of the Trust, in accordance with 29 U.S.C. § 1103.

24.     As of December 31, 2018, the Plan offered the following types of investment options: mutual funds, collective funds, Quest stock and a money market fund.

25.     Mutual funds are publicly-traded investment vehicles consisting of a pool of funds collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities.  Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the Securities and Exchange Commission ("SEC").  Mutual funds are subject to SEC regulation, and are required to provide certain investment and financial disclosures and information in the form of a prospectus.

26.     Collective funds, or collective investment trusts are, in essence, mutual funds without the SEC regulation.  Collective investment trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments.  Collective investment trusts were first organized under state law in 1927 and were blamed for the market crash in 1929.  As a result, collective investment trusts were severely restricted, giving rise to the more transparent and publicly-traded mutual funds.  Today, banks create collective investment trusts only for their trust clients and for employee benefit plans, like the Plan.  The main advantage of opting for a collective investment trust, rather than a mutual fund, is the negotiability of the fees, so larger retirement plans are able to leverage their size for lower fees.

B.     **ERISA's Fiduciary Standards**

27.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendant(s) as fiduciaries of the Plan. 29 U.S.C. § 1104(a), states, in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> (A)     for the exclusive purpose of

(i)      providing benefits to participants and their beneficiaries;

and

(ii)      defraying reasonable expenses of administering the plan;

[and]

(B)      with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like arms.

28.      Under 29 U.S.C. § 1103(c)(1), with certain exceptions not relevant here,

The assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

29.      Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and solely in the interest of participants in a plan.

30.      ERISA's fiduciary duties are "the highest known to the law" and must be performed "with an eye single" to the interest of the participants.

31.      Although ERISA fiduciaries must act in accordance with plan documents, that duty applies only if the plan documents are in accord with the fiduciary duties of ERISA.  29 U.S.C. § 1104(a)(1)(D).

32.      ERISA also imposes explicit co-fiduciary liabilities on plan fiduciaries.  29 U.S.C. § 1105(a) provides a cause of action against a fiduciary for knowingly participating in a breach by another fiduciary and knowingly failing to cure any breach of duty.  ERISA states, in

relevant part:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2)   if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)   if he has knowledge of a breach of such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

33.   29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. § 1109.  Section 1109(a) provides, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

34.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action, on behalf of the Plan, to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

11

C.   **Defendants' Violations of ERISA**

35.   As discussed in detail below, Defendants have severely breached their fiduciary duties of prudence and/or loyalty to the Plan. Plaintiff did not acquire knowledge regarding Defendants' breaches at issue here until shortly before this Complaint was filed.

### 1.   The Plan's Investment in the Fidelity Freedom Funds

36.   Among other investments, the Plan lineup offers a suite of 13 target date funds.  A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches.  Target date funds offer investors dynamic, easy asset allocation while providing both long-term growth and capital preservation.  All target date funds are inherently actively managed, because managers make changes to the allocations to stocks, bonds and cash over time.  These allocation shifts are referred to as a fund's glide path.  The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

37.   Since at least December 2010,[4] the Plan has offered the Fidelity Freedom fund target date suite.  Fidelity Management & Research Company ("Fidelity") is the second largest target date fund provider by total assets.  Among its several target date offerings, Fidelity's two most popular are the Freedom funds (the Active suite") and the substantially less costly Freedom Index funds (the "Index suite").  Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider.  Defendants failed to compare the Active and Index suites and consider their

---

[4]The Plan Form 5500s only provide a detailed schedule of the Plan's holdings for 2016-2018.  However, the Master Trust Agreement between Quest and Fidelity Management Trust Company, dated December 22, 2010, lists the suite of Fidelity Freedom funds as a Plan investment option.

respective merits and features.  A simple weighing of the benefits of the two suites indicates that the Index suite is a far superior option, and consequently the more appropriate choice for the Plan.  Had Defendants carried out their responsibilities in a single-minded manner with an eye toward solely the interests of the participants, they would have come to this conclusion and acted upon it.  Instead, Defendants failed to act in the sole interest of Plan participants, and breached their fiduciary duties by imprudently selecting and retaining the Active suite.

38.     The two fund families have nearly identical names and share a management team.[5]  But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[6] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices. The Active suite is also dramatically more expensive than the Index suite, and riskier in terms of both its underlying holdings and its asset allocation strategy.  Defendants' decision to add the Active suite over the Index suite, and the failure to replace the Active suite with the Index suite at any point during the Class Period (defined below), is a glaring breach of their fiduciary duties.

39.     Exacerbating Defendants' imprudent choice to add and retain the Active suite is its role as the Plan's Qualified Default Investment Alternative ("QDIA").  A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA.  Plan fiduciaries are responsible for the prudent selection

[5]Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014. The Index suite added Finola McGuire Foley to the team in 2018.
[6]Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

and monitoring of an appropriate QDIA.  The Fidelity Freedom fund with the target year that is closest to a participant's assumed retirement age (age 65) serves as the QDIA in the Plan.

40.     Given the fact that the vast majority of plan participants are not sophisticated investors, many of those in the Plan will largely, by default, concentrate their retirement assets in target date funds.  As such, the impact of an imprudent selection of target date funds is magnified vis-à-vis other asset categories.  Indeed, from 2016 to 2018, 37-41% of the Plan's assets were invested in the Active suite.

i.     The Active Suite is High-Risk and Unsuitable for Plan Participants

41.     The Active suite chases returns by taking higher levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan, and particularly those whose savings were automatically invested through the QDIA.  At first glance, the equity glide paths of the two fund families appear nearly identical, which would suggest both target date options have a similar risk profile.  However, the Active suite subjects its assets to significantly more risk than the Index suite, through multiple avenues.  At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily features actively managed mutual funds with a manager deciding which securities to buy and sell, and in what quantities.

42.     The goal of an active manager is to beat a benchmark—usually a market index or combination of indices.  Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement.  Actively managed funds tend to charge higher fees than index funds (which are passed on to the target date fund investor through higher expense ratios).  These extra costs present an additional hurdle for active managers to clear in

order to provide value and compensate investors for the added risk resulting from their decision-making. Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[7] Though they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market. The Active suite's allocation to primarily actively managed funds subjects investor dollars (and Plan participant dollars) to the decision-making skill and success (or lack thereof) and the risk associated therewith of the underlying managers.

43.    At all times across the glide path, the Active suite's top three domestic equity positions are in Fidelity Series funds (funds created for exclusive use in the Freedom funds), two of which have dramatically trailed their respective indices over their entire respective lifetimes. The Intrinsic Opportunities Fund, which is currently allocated 8.2% of the total assets in the 2040-2060 Funds, has, over its lifetime, also missed its benchmark, the Russell 3000 Index, by an astonishing 256 basis points (2.56%). The Large Cap Stock Fund, which is currently allocated 7.28% of the total assets in the 2040-2060 Funds, has suffered even worse underperformance; its lifetime returns trail that of its benchmark, the S&P 500 Index, by 324 basis points (3.24%). The portfolio of the Active suite is diversified among 32 underlying investment vehicles; the two aforementioned series funds represent over 15% of the 2040 through 2060 vintages, meaning for at least 20 years, 15% of investor dollars are subject to the poor judgment exercised by just those two managers.

44.    Compounding the level of risk inherent in the Active suite's underlying holdings is the suite's managers' approach to portfolio construction and asset allocation decisions.

---

[7] "How Actively and Passively Managed Funds Performed: Year-End 2018";
https://www.morningstar.com/insights/2019/02/12/active-passive-funds.

Returning to the equity glide paths discussed above, the Active and Index suites appear to follow essentially the same strategy.  The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

This chart only considers the mix of the portfolio at the level of stocks, bonds and cash.  A deeper examination of the sub-asset classes of the Active suite's portfolio, however, exposes the significant risks its managers take in an effort (albeit consistently unsuccessful) to boost returns. Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite.  Likewise, the Active suite has higher exposure to classes like emerging markets and high yield bonds.

45.     Since the series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points in either direction.  In a departure from the previously accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts in order to locate underpriced securities, which the firm dubs "active asset allocation."  This strategy heaps further unnecessary risk on investors, including the Plan participants, in the Active suite.  A March 2018 Reuters special report[8] on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."  The

---

[8]"Special Report: Fidelity puts 6 million savers on risky path to retirement," https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes "it was not clear to us that [the managers of the Active suite] knew what they were doing." While many target date fund managers were increasing exposure to riskier investments in an effort to augment performance, the president of the research firm, Target Date Solutions, opines that the Active suite has gone further down this path than its peers[9] - thereby taking on additional risk on behalf of the Plan participants.  Morningstar has noted in the past that active management has hindered the Active suite's performance, criticizing a previous poor decision to heavily weight to commodities.  The investment research firm similarly appraised Fidelity's shifts in the allocation of stocks between 1996 and 2010 as "shocking" and "seemingly chaotic."  Yet, since 2014, a fund family with a history of poor decisions has been given carte blanche to take further risks to the detriment of the Plan and its participants.

46.     This desire and latitude to assume more risk exposes investors in what Fidelity brands "a lifetime savings solution" to significant losses in the event of volatility similar to the downturn experienced during the COVID-19 epidemic.  Morningstar analyst Jeff Holt has stated that the popularity of target date funds derives from investors' belief that the funds are designed to "not lose money."  Fair or not, the unsophisticated investor, such as the participants in the Plan, tends to gravitate toward the all-in-one savings solution a target date fund purports to offer. Given this reality, Plan participants should be shielded from the riskiest fund families where active manager decisions could amplify losses in periods of market decline.  The Active suite's lack of downside protection has been magnified by the current COVID-19 crisis and is felt most sharply by Plan participants approaching their target date of retirement.  That is because Plan participants close to retirement age do not have ample time to recoup significant losses before

[9] *Id.*

they start withdrawing their retirement savings.  In contrast, the more conservative Fidelity Freedom Index 2020 Fund has handled the current volatility well, with year to date returns through June 24, 2020 ranking in the 29th percentile among other 2020 target date funds.[10] Unfortunately, the Fidelity Freedom 2020 Fund (i.e., part of the Active suite), in which the Plan had nearly $230 million at the end of 2018, ranks in the 68th percentile among the same peer group.

ii.   <u>The Active Suite's Considerable Cost</u>

47.     Even a minor increase in a fund's expense ratio (the total annual cost to an investor, expressed as a percentage of assets), can considerably reduce long-term retirement savings.  The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs.  While the Institutional Premium share class for each target year of the Index suite charges a mere 8 basis points (0.08%), the K share class of the Active suite— which the Plan offers—has expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).

| Cost Comparison | | | | | | |
|---|---|---|---|---|---|---|
| Freedom Suite | Ticker | Exp Rat | Freedom Index Suite | Ticker | Exp Rat | Difference |
| Income K | FNSHX | 0.42% | Income Inst Prem | FFGZX | 0.08% | -0.34% |
| 2005 K | FSNJX | 0.42% | 2005 Inst Prem | FFGFX | 0.08% | -0.34% |
| 2010 K | FSNKX | 0.46% | 2010 Inst Prem | FFWTX | 0.08% | -0.38% |
| 2015 K | FSNLX | 0.49% | 2015 Inst Prem | FIWFX | 0.08% | -0.41% |
| 2020 K | FSNOX | 0.53% | 2020 Inst Prem | FIWTX | 0.08% | -0.45% |
| 2025 K | FSNPX | 0.56% | 2025 Inst Prem | FFEDX | 0.08% | -0.48% |
| 2030 K | FSNQX | 0.60% | 2030 Inst Prem | FFEGX | 0.08% | -0.52% |
| 2035 K | FSNUX | 0.63% | 2035 Inst Prem | FFEZX | 0.08% | -0.55% |
| 2040 K | FSNVX | 0.65% | 2040 Inst Prem | FFIZX | 0.08% | -0.57% |
| 2045 K | FSNZX | 0.65% | 2045 Inst Prem | FFOLX | 0.08% | -0.57% |
| 2050 K | FNSBX | 0.65% | 2050 Inst Prem | FFOPX | 0.08% | -0.57% |
| 2055 K | FNSDX | 0.65% | 2055 Inst Prem | FFLDX | 0.08% | -0.57% |
| 2060 K | FNSFX | 0.65% | 2060 Inst Prem | FFLEX | 0.08% | -0.57% |

---

[10] For Morningstar's peer group rankings, 1st percentile is the best performers.

48.     The higher fee, charged by the 2040 through 2060 Active funds, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay.  The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



49.     Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's current investment in the Active suite to the Institutional Premium share class of the Index suite, in 2018 alone, the Plan could have saved approximately $8 million in costs – which Plan participants unreasonably paid for to their detriment.  This tremendous cost difference goes straight into Fidelity's pockets.  As the costs for

recordkeeping services have dropped precipitously over the past decade,[11] recordkeepers like Fidelity have been forced to chase profits elsewhere.  The management fees derived from a plan's use of a provider's investment offerings substantially trump any compensation for recordkeeping services.  Thus, Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it provides recordkeeping services, including the Plan.  Of course, it is Defendants' responsibility to ensure that Plan recordkeeping expenses and all other expenses of the Plan are reasonable – which plainly was not the case in the instance of the Plan.

iii. <u>Investors Have Lost Faith in the Active Suite</u>

50. The flow of funds to, or from, target date families constitute one indicator of the preferences of investors at large.  According to Morningstar's report on the 2019 Target Date Fund Landscape,[12] investor demand for low-cost target date options has skyrocketed in recent years.  Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.  At the same time, investor confidence in the Active suite has deteriorated; in 2018, the series experienced an estimated $5.4 billion in net outflows.  The movement of funds out of the Active suite has been substantial for years; the Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years.  Defendants' act in offering and maintaining the Active suit in the Plan, evidences their failure to monitor, recognize or act upon investors' crumbling confidence in the Active suite, while ignoring the simultaneous surge in faith in the Index suite – which is and has been much better suited for the Plan at all pertinent times.

---

[11]"NEPC: Corporate Defined Contribution Plans Report Flat Fees," https://www.nepc.com/press/nepc-corporate-defined-contribution-plans-report-flat-fees.
[12]"2019 Target-Date Fund Landscape: Simplifying the Complex."

iv.   The 5-Star Index Suite

51.     Morningstar assigns each mutual fund in its extensive database a star rating,

which is a "purely mathematical measure that shows how well a fund's past returns have

compensated shareholders for the amount of risk it has taken on."  This measurement

emphatically favors the Index suite.  Each Fidelity Freedom Index fund bears a higher star rating

than the corresponding Active fund (other than the 2055 Index Fund, which has the same 4 stars

as the 2055 Active Fund).  With the exception of the 2020, 2055, and 2060 iterations (each 4

stars), the full Index suite is assigned 5 stars, Morningstar's highest rating.  The risk-adjusted

returns of funds with a 5-star rating rank in the top 10% of their peers.  The Active suite does not

achieve a single 5-star rating.  Defendants were likely aware, or should have been aware, of the

higher ratings of the Index suite, yet continued to offer the Active suite, to the detriment of Plan

participants at all pertinent times.

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| Freedom Suite | Ticker | Stars | Freedom Index Suite | Ticker | Stars |
| Income K | FNSHX | 4 | Income Inst Prem | FFGZX | 5 |
| 2005 K | FSNJX | 4 | 2005 Inst Prem | FFGFX | 5 |
| 2010 K | FSNKX | 3 | 2010 Inst Prem | FFWTX | 5 |
| 2015 K | FSNLX | 3 | 2015 Inst Prem | FIWFX | 5 |
| 2020 K | FSNOX | 3 | 2020 Inst Prem | FIWTX | 4 |
| 2025 K | FSNPX | 3 | 2025 Inst Prem | FFEDX | 5 |
| 2030 K | FSNQX | 4 | 2030 Inst Prem | FFEGX | 5 |
| 2035 K | FSNUX | 4 | 2035 Inst Prem | FFEZX | 5 |
| 2040 K | FSNVX | 3 | 2040 Inst Prem | FFIZX | 5 |
| 2045 K | FSNZX | 3 | 2045 Inst Prem | FFOLX | 5 |
| 2050 K | FNSBX | 3 | 2050 Inst Prem | FFOPX | 5 |
| 2055 K | FNSDX | 4 | 2055 Inst Prem | FFLDX | 4 |
| 2060 K | FNSFX | 3 | 2060 Inst Prem | FFLEX | 4 |

v.   The Active Suite's Inferior Performance

52.     In the period following the strategy overhaul in 2013 and 2014, the Active suite's

higher levels of risk have failed to produce substantial outperformance when compared to the

21

Index suite.  While assuming significantly higher levels of risk with investor dollars (and among them, the Plan participants' hard-earned savings) and charging more to investors, the Active suite has simply failed to measure up to the returns produced by its index cousin, in which the Plan participants' assets would have been and would be significantly better off.  Since the strategic changes took effect in 2014, the Index suite has outperformed the Active suite in four out of six calendar years.  Broadening the view to historical measures that encompass a period closer to a full market cycle, the Active suite has substantially underperformed the Index suite on a trailing 3- and 5-year basis.

| 3-Year Trailing Performance as of 4/30/20 | | | | |
|---|---|---|---|---|
| **Freedom Suite** | **Return** | **Freedom Index Suite** | **Return** | **Difference** |
| Income K | 3.78% | Income Inst Prem | 4.87% | -1.09% |
| 2005 K | 4.08% | 2005 Inst Prem | 5.22% | -1.14% |
| 2010 K | 4.24% | 2010 Inst Prem | 5.43% | -1.19% |
| 2015 K | 4.34% | 2015 Inst Prem | 5.59% | -1.25% |
| 2020 K | 4.35% | 2020 Inst Prem | 5.65% | -1.30% |
| 2025 K | 4.37% | 2025 Inst Prem | 5.71% | -1.34% |
| 2030 K | 4.60% | 2030 Inst Prem | 6.00% | -1.40% |
| 2035 K | 4.29% | 2035 Inst Prem | 5.76% | -1.47% |
| 2040 K | 3.95% | 2040 Inst Prem | 5.40% | -1.45% |
| 2045 K | 3.94% | 2045 Inst Prem | 5.39% | -1.45% |
| 2050 K | 3.92% | 2050 Inst Prem | 5.40% | -1.48% |
| 2055 K | 3.95% | 2055 Inst Prem | 5.40% | -1.45% |
| 2060 K | 3.92% | 2060 Inst Prem | 5.39% | -1.47% |

| 5-Year Trailing Performance as of 4/30/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 3.48% | Income Inst Prem | 3.79% | -0.31% |
| 2005 K | 3.85% | 2005 Inst Prem | 4.24% | -0.39% |
| 2010 K | 4.14% | 2010 Inst Prem | 4.56% | -0.42% |
| 2015 K | 4.37% | 2015 Inst Prem | 4.84% | -0.47% |
| 2020 K | 4.48% | 2020 Inst Prem | 4.98% | -0.50% |
| 2025 K | 4.57% | 2025 Inst Prem | 5.13% | -0.56% |
| 2030 K | 4.94% | 2030 Inst Prem | 5.58% | -0.64% |
| 2035 K | 4.93% | 2035 Inst Prem | 5.65% | -0.72% |
| 2040 K | 4.73% | 2040 Inst Prem | 5.43% | -0.70% |
| 2045 K | 4.71% | 2045 Inst Prem | 5.43% | -0.72% |
| 2050 K | 4.71% | 2050 Inst Prem | 5.43% | -0.72% |
| 2055 K | 4.72% | 2055 Inst Prem | 5.42% | -0.70% |
| 2060 K | 4.67% | 2060 Inst Prem | 5.43% | -0.76% |

53.     It is unclear at what point in 2014 the Active suite's major strategic changes were complete, but using a start date of January 1, June 30, or December 31, 2014, the Index suite has outperformed the Active suite to date.  Investing research and information websites commonly show the growth of $10,000 invested in a mutual fund and a benchmark over a period to provide a comparison of returns in a simple-to-understand format.  Using this method to compare the two suites, at each proposed start date, across every vintage of the fund families, the Index suite would have earned investors significantly greater sums on a $10,000 investment.  Defendants breached their fiduciary duty to Plan participants by choosing to select and retain the Active suite, thus causing Plan participants to miss out on greater investment returns for their retirement savings that were readily available.

**2.     The Plan's Objectively Imprudent Investment Options**

54.     In addition to the Active suite, Defendants have saddled participants with additional objectively imprudent investment options.  It is a basic principle of investment theory that the risks associated with an investment must first be justified by its potential returns for that investment to be rational.  This principle applies even before considering the purpose of the

investment and the needs of the investor, such as the retirement assets here.  The Capital Asset Pricing Model ("CAPM"), which is used for pricing securities and generating expected returns for assets given the risk of those assets and the cost of capital, provides a mathematical formula distilling this principle:

$ERi=Rf+\beta i(ERm-Rf)$, where:

$ERi$=expected return of investment

$Rf$=risk-free rate

$\beta i$=beta of the investment

$(ERm-Rf)$=market risk premium

Applied here and put simply, the $\beta i$ is the risk associated with an actively managed mutual fund or collective trust, which can only be justified if the $ERi$ of the investment option is, at the very least, above that of its benchmark, $Rf$.[13]  Otherwise, the model collapses, and it would be imprudent to assume any risk without achieving associated return above the benchmark returns.

### i.    The DFA US Small Cap Value Portfolio

55.    The DFA US Small Cap Value Portfolio Institutional Class has consistently and significantly underperformed its benchmark, the Russell 2000 Value Index.  Indeed, the fund failed to beat its benchmark once in the six years from 2014 to 2019, a ghastly performance history which included dramatic underperformance by a whopping 348 basis points (3.48%) in 2016 and 427 basis points (4.27%) in 2019.

---

[13]In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.



56.     When the investment option's track record is so apparently poor, as it is here, the Plan should necessarily replace the fund with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  By way of example and to illustrate, there is a Vanguard Russell 2000 Value Index Fund that simply tracks the Russell 2000 Value Index, with a very low expense ratio of 8 basis points (0.08%).  While participants should have had the option to achieve the index's returns at minimal cost, Defendants' imprudence in retaining the Small Cap Value Portfolio instead forced them to pay 51 basis points (0.51%) to consistently lag the index.  Defendants' failure to replace underperforming investment options with better performing alternatives was a clear breach of fiduciary duty.

ii.     The Invesco Global Real Estate Fund

57.     The Invesco Global Real Estate Fund R5 Class has similarly been a persistent poor performer against its benchmark, the S&P Global REIT Total Return Index.  The Fund trailed its index in 5 of the 6 calendar years from 2014-2019 and, at times, alarmingly so.  In 2014 alone, the fund managed to lag the performance of its index by 801 basis points (8.01%).



58.     When the investment option's track record is so apparently poor, as it is here, the Plan should necessarily replace the fund with an alternative that has demonstrated the ability to consistently outperform the benchmark, or, at the very least, retain an alternative that tracks the benchmark.  Defendants' failure to do so constitutes a breach of their fiduciary duty.  Should they desire to invest in real estate, Plan participants currently pay 92 basis points (0.92%) for the pleasure of receiving the Global Real Estate Fund's poor returns.  Plan participants would be much better served, for example, had Defendants replaced the fund with an alternative such as the Admiral class of either the Vanguard Real Estate Index Fund or the Vanguard Global ex-US Real Estate Index Fund, which both bear a mere 12 basis point (0.12%) expense ratio.

### 3.     The Plan's Payment of Excessive Recordkeeping Fees

59.     Throughout the Relevant Time Period defined below, Fidelity was paid compensation for recordkeeping services in excess of the contractually required amount.  From July 1, 2014 through June 30, 2018, Fidelity was entitled to a $31 per participant annual fee for its recordkeeping and administrative services; the charge was reduced $30 per participant on July

1, 2018.[14]  The Form 5500s filed by the Plan prior to 2017 do not contain sufficient detail to enable a calculation of the total recordkeeping fee received by Fidelity, but data reported in the Form 5500s for both 2017 and 2018 confirms that Fidelity received amounts in excess of $31 and $30 per participant.

|  | 2017 | 2018 |
|---|---|---|
| Participants | 40,077 | 40,488 |
| Direct Payment Received by Fidelity | $205,049 | $926,637 |
| Revenue Sharing Used by Fidelity | $1,425,000 | $619,000 |
| Total Compensation to Fidelity | $1,630,049 | $1,545,637 |
| **Amount Per Participant** | **$40.67** | **$38.18** |

The payment of recordkeeping fees in excess of the contractually required amount likewise is a clear and, frankly, inexcusable breach of fiduciary duty.

60.     Fidelity not only received amounts via direct payment from the Plan, it also collected revenue sharing payments which dramatically exceeded the total sum Fidelity was owed.  Under the terms of its arrangement with the Plan, Fidelity remitted certain amounts in excess of its required fee to participant accounts.  For the two years of 5500 reports that provide this data, Fidelity allocated $4.96 million back to participants in 2018 and $3.36 million in 2017. As a result of Fidelity's failure to remit to participants the full amount of excess revenue sharing it received, and Defendants' failure to secure the amounts owed from Fidelity, the Plan paid its recordkeeper approximately $330,997 in 2018 and $388,662 in 2017 more than the amounts to which Fidelity was entitled.  Defendants likely also overpaid Fidelity for recordkeeping services in other pertinent years as well since they clearly failed to maintain a system to ensure that Fidelity was not overpaid.

---

[14]Seventh and Twelfth Amendments to Master Trust Agreement between Fidelity Management Trust Company and Quest Diagnostics Incorporated.

### 4.     The Failure to Use the Least Expensive Share Class

61.     As fiduciaries charged with selecting, monitoring, and removing the

Plan's investment options, Defendants breached their duty of prudence by failing to monitor the

Plan's investment options to ensure that they were not excessively priced.

62.     There is no distinction whatsoever, other than price, between the share classes for

the same investment option.  The share class used is typically, if not always, dependent on the

negotiating leverage of the investor.  In other words, large institutional investors, such as the

Plan, have significant amounts of monies to invest, which incentivizes mutual fund managers to

agree to lower fees/offer cheaper share classes for access to those Plan assets.  Despite the

negotiating leverage based on the size of the Plan, Defendants failed to utilize the cheapest share

class for some of the investment options offered within the Plan, presumably to account for the

revenue sharing included in the higher fee (which, as demonstrated above, was needlessly

excessive):

- **Invesco Global Real Estate Fund:** The Plan invested in Class R5 shares, which carry a 0.92% expense ratio, even though the fund offers Class R6 shares, which have a 0.83% expense ratio.  At all times that the fund was a Plan investment option,[15] and the Plan paid 0.11% more than the least expensive share class available to it;

- **MFS Global Equity Fund R4:** The Plan invested in Class R4 shares, which carry a 0.91% expense ratio, even though the fund offers Class R6 shares, which have a 0.82% expense ratio.  At all times that the fund was a

---

[15]As noted earlier, the Plan Form 5500s only provide a detailed schedule of the Plan's holdings for 2016-2018.

Plan investment option, and the Plan paid 0.09% more than the least expensive share class available to it.

63.     Although Plaintiff does not challenge the practice of revenue sharing in general, there was no need for the Plan to invest in share classes of the aforementioned funds that provide revenue sharing.  Per the Plan's agreement with Fidelity, the Invesco Global Real Estate Fund R5 Class provided 0.35% of revenue sharing, while the MFS Global Equity Fund R4 Class provided 0.15%.  Given the dramatically excessive amount of revenue sharing credits Fidelity received and was forced to reallocate to participants in 2017 and 2018 (as well as in other years), the inclusion of the more expensive share classes of those two funds in the Plan lineup represents an obvious and unnecessary oversight by Defendants.  All of this information was known and/or available to Defendants, and yet Defendants failed to act in a reasonable manner in the interest of the Plan, thereby constituting breach of their fiduciary duties.

## CLASS ACTION ALLEGATIONS

64.     This action is brought as a class action by Plaintiff on behalf of herself and the following proposed class ("Class"):

**Class**:

> All participants and beneficiaries in the Quest Employee Savings Plan (the "Plan") at any time on or after June 29, 2014 to the present (the "Class Period" or "Relevant Time Period"), including any beneficiary of a deceased person who was a participant in the Plan at any time during the Class Period.

Excluded from the Class are Defendants and Judge to whom this case is assigned or any other judicial officer having responsibility for this case who is a beneficiary.

65.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

66.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

67.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)     Whether Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants for the exclusive purpose of providing benefits to participants and their beneficiaries;

(b)     Whether Defendants breached their fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plan; and

(c)     Whether and what form of relief should be afforded to Plaintiff and the Class.

68.     **Typicality**.  Plaintiff, who is a member of the Class, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories that are applicable as to all other members of the Class.

69.     **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

70.     **Potential Risks and Effects of Separate Actions**.  The prosecution of separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual Class members that would establish incompatible

standards of conduct for the party opposing the Class; or (B) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

71. **Predominance**. Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues. Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar Class certification.

72. **Superiority**. A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class members are unaware of Defendants' breaches of fiduciary duty such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members would be too small to economically justify individual litigation. Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

73. **Manageability**. This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

74.     Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

## COUNT I
### (For Breach of Fiduciary Duty)

75.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

76.     Defendants' conduct, as set forth above, violates the fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A), (B), and (C), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely, in the interest of the Plan's participants and their beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and like aims, and (c) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

77.     As a direct result of Defendants' breaches of duties, Plaintiff and the Plan have suffered losses and damages.

78.     Pursuant to ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or

remedial relief, including prospective injunctive and declaratory relief, as well as attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II
**(Failure to Monitor Fiduciaries and Co-Fiduciary Liability)**

79.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

80.     Quest is responsible for appointing, overseeing, and removing members of the Committees who, in turn, are responsible for appointing, overseeing, and removing members of the Committees.

81.     In light of its appointment and supervisory authority, Quest had a fiduciary responsibility to monitor the performance of the Committees and their members.  In addition, Quest and the Committees had a fiduciary responsibility to monitor the performance of the members of the respective Committees.

82.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and its participants when they are not.

83.     To the extent that fiduciary monitoring responsibilities of Quest or the Committees were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

84.     Quest and the Committees breached their fiduciary monitoring duties by, among other things:

(a)     Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered

enormous losses as a result of the appointees' imprudent actions and omissions with respect to the Plan;

(b)     Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(c)     Failing to remove appointees whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and its participants' retirement savings.

85.     As a consequence of these breaches of the fiduciary duty to monitor, the Plan suffered substantial losses.  Had Quest and the Committees discharged their fiduciary monitoring duties prudently as described above, the losses suffered by the Plan would have been minimized or avoided entirely.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants have lost millions of dollars of retirement savings.

86.     Quest and the Committees are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

87.     Each of the Defendants also knowingly participated in the breaches of the other Defendants, knowing that such acts were a breach; enabled the other Defendants to commit a breach by failing to lawfully discharge their own fiduciary duties; and knew of the breaches by the other Defendants and failed to make any reasonable effort under the circumstances to remedy

the breaches. Defendants, thus, are liable for the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III
### (In the Alternative, Liability for Knowing Breach of Trust)

88.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

89.     In the alternative, to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from participating in a knowing breach of trust.

90.     To the extent that any of the Defendants are not deemed to be fiduciaries and/or are not deemed to be acting as co-fiduciaries for any and all applicable purposes, any such Defendants are liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in breaches of fiduciary duty by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan.

WHEREFORE, Plaintiff, on behalf of herself and the Plan, demands judgment against Defendants, for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502, 29 U.S.C. § 1132, as detailed above;

(b)     Equitable, legal or remedial relief to return all losses to the Plan and/or for restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409 and 502, 29 U.S.C. §§ 1109 and 1132, as detailed above;

(c)     Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs, and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Plan may be justly entitled and the Court deems appropriate and just under all the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and Secretary of Treasury by certified mail, return receipt requested.

Dated: June 29, 2020                     Respectfully Submitted,

                                         SHEPHERD, FINKELMAN,
                                         MILLER & SHAH, LLP

                                         /s/ James C. Shah
                                         James C. Shah
                                         Shepherd Finkelman Miller
                                          & Shah, LLP
                                         475 White Horse Pike
                                         Collingswood, NJ 08107
                                         Telephone: (856) 858-1770
                                         Facsimile: (866) 300-7367
                                         Email: jshah@sfmslaw.com

Ronald S. Kravitz
Kolin C. Tang
Shepherd Finkelman Miller
& Shah, LLP
201 Filbert Street, Suite 201
San Francisco, CA 94133
Telephone: (415) 429-5272
Facsimile: (866) 300-7367
Email: rkravitz@sfmslaw.com
         ktang@sfmslaw.com

James E. Miller
Laurie Rubinow
Shepherd Finkelman Miller
& Shah, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email: jmiller@sfmslaw.com
         lrubinow@sfmslaw.com

Sahag Majarian
Law Offices of Sahag Majarian
18250 Ventura Blvd.
Tarzana, CA 91356
Telephone: (818) 609-0807
Facsimile: (818) 609-0892
Email: sahagii@aol.com

***Attorneys for Plaintiff, the Plan,
and the Proposed Class***