UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE QUEST DIAGNOSTICS INCORPORATED ERISA LITIGATION | Civil Action No. 20-07936 (JXN) (JRA)<br><br>OPINION |

**NEALS**, District Judge:

This matter comes before the Court on the following motions: (1) Plaintiffs Lawanda Lasha House Johnson, Rebecca A. Rice, and Shalamar Curtis's ("Plaintiffs") motion for class certification pursuant to Federal Rule of Civil Procedure 23 (ECF No. 107);[1] (2) Defendants Quest Diagnostic Incorporated ("Quest"), the Quest Benefits Administration Committee ("BAC"), and the Quest Investment Committee's ("IC" or "Committee") (collectively, "Defendants") motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 (ECF No. 119); (3) Defendants' motion to exclude the opinions and testimony of Martin Dirks pursuant to Federal Rule of Evidence 702 (ECF No. 116); and (4) Plaintiffs' motion to exclude the opinions and testimony of Jonathan Reuter pursuant to Federal Rule of Evidence 702 (ECF No. 124). Jurisdiction and venue are proper pursuant to 28 U.S.C. §§ 1331 and 1132(e), respectively. The Court has carefully considered the parties' submissions and decides this matter without oral argument under Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1(b).

For the reasons set forth below, Defendants' motion for summary judgment (ECF No. 119) is **GRANTED**, and Plaintiffs' Consolidated Complaint ("Compl." or "Complaint") (ECF No. 10) is **DISMISSED with prejudice**. Additionally, Plaintiffs' motions for class certification (ECF No. 107) and to exclude the opinions and testimony of Jonathan Reuter (ECF No. 124), and

---

[1] Unless otherwise indicated, the Court refers to the ECF page numbers.

1

Defendants' motion to exclude the opinions and testimony of Martin Dirks (ECF No. 116) are **DENIED as moot**.

I. <u>**BACKGROUND AND PROCEDURAL HISTORY**</u>

On October 2, 2020, Plaintiffs—former employees of Quest and participants in the Plan—filed a Consolidated Class Action Complaint ("Consolidated Complaint") seeking to recover damages under Employee Retirement Income Security Act of 1974, as amended 29 U.S.C. § 1001, *et seq.* ("ERISA") for Defendants' (1) alleged breach of fiduciary duties (Count I); (2) failure to monitor (Count II); and, in the alternative to the ERISA claims, (3) breach of trust for imprudent Plan management (Count III). (*See generally* ECF No. 10).[2] The relevant facts follow.

A. <u>**The Plan**</u>

Quest is "a major provider of clinical laboratory and anatomic pathology testing and related services in the United States." (Defs.' Statement of Undisputed Material Facts (ECF No. 121) ("DSOF") ¶ 1[3]; Pls.' Statement of Facts in Opposition to Summary Judgment (ECF No. 136-1) ("PSOF") ¶ 1). Quest sponsors its 401(k) Savings Plan, a defined contribution plan that provides retirement benefits to eligible employees. (DSOF ¶¶ 4, 11; PSOF ¶¶ 4, 11).[4] As of December 2020, the Plan had 57,226 participants with account balances and assets totaling approximately five billion dollars. (DSOF ¶ 8; PSOF ¶ 8). Plaintiffs bring this action on behalf of all participants and beneficiaries of the Plan from June 29, 2014, to present (the "Relevant Period"). (DSOF ¶ 24; PSOF ¶ 24).

The Plan offered participants different investment options, including "various actively

---

[2] Raquel Aziz was initially a named Plaintiff in this matter. (*See generally* ECF No. 10). On June 13, 2022, the Court granted Plaintiffs' motion to withdraw Raquel Aziz as a named plaintiff under Federal Rule of Civil Procedure 21. (ECF No. 78).
[3] For brevity, all citations to the parties' Rule 56.1 statements incorporate the evidentiary citations contained therein.
[4] "[A] 'defined contribution plan' . . . promises the participant the value of an individual account at retirement, which is largely a function of the amounts contributed to that account and the investment performance of those contributions." *LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 250 n.1 (2008).

managed mutual funds, passively managed index funds, and Quest company stock." (DSOF ¶ 13; PSOF ¶ 13).[5] Relevant here, Plaintiffs challenge the Plan's maintenance of the Invesco Global Real Estate Fund ("Invesco Fund"), the DFA U.S. Small-Cap Value Fund ("DFA Fund"), and the Fidelity Freedom Funds ("Freedom Funds") (collectively, the "Challenged Funds"). (DSOF ¶ 22; PSOF ¶ 22).

### B. The IC

The IC maintains responsibility "for the oversight and management of the investments in the Plan." (DSOF ¶ 21; PSOF ¶ 21). The IC is responsible for: (1) "determining the types of investment options offered by the Plan to provide a broad selection of investment across the risk/return spectrum;" (2) "establishing performance standards for each investment fund in the Plan;" (3) "selecting investment funds based on fund and Plan objectives;" (4) "reviewing and evaluating performance results of the investment funds against established performance standards;" (5) "approving investment fund agreements and changes to those agreements"; and (6) "taking corrective action when an investment fails to perform against established IPS objectives, guidelines and standards." (DSOF ¶ 22; PSOF ¶ 22). The IC "received annual fiduciary trainings about their fiduciary obligations that covered, among other things, the 'issues they needed to consider while selecting, monitoring, and changing managers of investments in the plan.'" (DSOF ¶ 55; PSOF ¶ 55).

The IC sought investment advice from an investment advisor, Mercer Investment Consulting, Inc. ("Mercer") for the first part of the Relevant Period, and later in the Relevant Period, AON Investment Consulting provided those services. (DSOF ¶¶ 23-24; PSOF ¶¶ 23-24). During the Relevant Period, Mercer prepared Performance Evaluation Reports that "set forth investment

---

[5] If participants did not make active investment choices, "the contributions are directed into the fund in the Freedom Funds with the target date closest to the participant's attainment of age sixty-five." (DSOF ¶ 19; PSOF ¶ 19).

3

returns of the Challenged Funds on one-year, three-year, five-year, and ten-year bases; identified funds placed on Watch; and provided an overview and analysis of external market activity, economic indicators, and regulatory as well as legislative updates relevant to the Plan's investments."  (DSOF ¶¶ 43-44; PSOF ¶¶ 43-44).

The IC met on a quarterly basis to review the Challenged Funds. (DSOF ¶¶ 40-41; PSOF ¶¶ 40-41).  After the meetings, the IC's secretary prepared meeting minutes outlining what was discussed.  (DSOF ¶ 46; PSOF ¶ 46).  The Mercer reports were "part of the documentary record of the [C]ommittee's process."  (Reply Declaration of Melissa Hill ("Hill Reply Decl."), Ex. 138, ECF No. 140-3 at 127:9-12).

### C. The Investment Policy Statement

The IPS "serves as a framework to help the Investment Committee assess the performance of the investment options offered by the Plans."  (Declaration of Melissa Hill ("Hill Decl."), Ex. 80, ECF No. 122-6 at 567).  The IPS provides the IC with "a number of qualitative and quantitative factors [to consider] when selecting and monitoring an investment option[,]" but notes "[n]o single factor will determine whether an investment option should be added, retained, or eliminated; however, certain factors may carry more weight in the Investment Committee's final analysis."[6]  (Hill Decl., Ex. 80, ECF No. 122-6 at 568).

The IPS further provides:

> Investment funds may be placed on "watch" status, replaced or terminated whenever the Investment Committee losses confidence in the management of the fund, when the characteristics of the fund are no longer consistent with the fund's intended role within the Plan, or when the Investment Committee determines that the current style is no longer appropriate.

---

[6] The IPS outlines "[e]xamples of evaluation factors for diversified funds" in different categories: (i) equity investments; (ii) bond/stable value/money market investments; (iii) performance; (iv) risk; (v) costs; and (vii) management.  (Hill Decl., Ex. 80, ECF No. 122-6 at 568-69).

(Hill Decl., Ex. 80, ECF No. 122-6 at 571). The IPS further outlines factors the IC "may" consider that "may cause the Investment Committee to lose confidence in a fund." (*Id.*) In pertinent part, the IC may consider the performance of the investment funds and provides:

> Continued performance shortfalls versus the performance standards set forth in this policy. Performance should be evaluated over at least a three-year period to provide fund management sufficient time to execute its strategy over full market cycles. Depending upon market conditions, the Committee may decide that a longer period is warranted, however, a three-year period is generally sufficient for evaluating performance.

(*Id.*; *see also* Hill Decl., Ex. 80, ECF No. 122-6 at 569-70 ("The Investment Committee generally will not consider changes to an individual fund until the fund has been offered by a Plan for at least three years, in order to allow sufficient time to judge the performance of the fund over a full market cycle.")).

Further, the IPS indicates that funds placed on "watch status" generally remain there "for a period of time before a decision to terminate the fund is made[;] [t]here may be, however, circumstances under which the Investment Committee may determine to terminate a fund without placing it on watch first." (Hill Decl., Ex. 80, ECF No. 122-6 at 572).

### D. The IC's Monitoring Process for the Challenged Funds[7]

#### i. Fidelity Freedom Funds

The Freedom Funds are a suite of target-fate funds[8] (TDFs), which are "long-term investment vehicles that invest in a single fund that bundles asset allocation and portfolio management." (DSOF ¶ 74; PSOF ¶ 74). During a December 9, 2015 IC meeting, the IC met

---

[7] The parties, at most, make *de minimis* reference to the DFA Funds in their briefings on the motion for summary judgment. Where a party fails to "respond to . . . arguments on [certain] claims or mention them at all in [their] brief," those claims are waived. *Yucis v. Sears Outlet Stores, LLC*, No. 18-15842, 2019 WL 2511536, at *4 & n.4 (D.N.J. June 18, 2019) (collecting cases), *aff'd as modified*, 813 F. App'x 780 (3d Cir. 2020). Accordingly, the Court finds Plaintiffs have waived their claims pertaining to the DFA Fund.
[8] TDFs "are designed to provide participants who do not want to construct their own portfolio with a single actively managed, diversified investment option." (DSOF ¶ 16; PSOF ¶ 16).

with Fidelity and received information about Fidelity's management strategy for the Freedom Funds. (Hill Decl., Ex. 21, ECF No. 122-1 at 562). On July 11, 2016, Mercer met Fidelity Investments for an update on Freedom Funds and subsequently upgraded its rating from B to B+. (Hill Decl., Ex. 51, ECF No. 122-3 at 160-61). The IC also directed Mercer to conduct ad hoc analyses of the Freedom Funds, focusing on their performance versus alternative options and their glide path, and in October 2016, Mercer presented a "glide path analysis" whereby it evaluated the Freedom Funds' "asset allocation strategy" and concluded it was a "good fit." (DSOF ¶¶ 82, 86; PSOF ¶¶ 82, 86). Additionally, in 2016, Mercer recommended the continued maintenance of the Freedom Funds. (DSOF ¶ 87; PSOF ¶ 87).

Further, in Q4 2019, Mercer recommended that the IC "decide whether to continue offering participants actively managed target funds or to change to passively managed target funds." (Hill Decl., Ex. 98, ECF No. 122-7 at 196). Mercer was appointed by the IC "to assist in the evaluation and selection of an index target-date funder manager to possibly replace the actively managed Fidelity Freedom Funds." (Hill Decl., Ex. 99, ECF No. 122-7 at 198). Mercer subsequently prepared a "Manager Search Report" whereby it compared the Freedom Funds with four passively managed target-date funds and did not recommend the IC choose any of the alternatives. (DSOF ¶¶ 90-91; PSOF ¶¶ 90-91). Throughout 2020 and 2021, the IC continued to "scrutinize" the Freedom Funds. (DSOF ¶ 93; PSOF ¶ 93). Mercer recommended placing the Freedom Funds on Watch in Q1 through Q3 2020, (Declaration of James C. Shah ("Shah Decl."), Ex. 5, ECF No. 135-5 at 8; Hill Decl., Ex. 66, ECF No. 122-5 at 673, Hill Decl., Ex. 67, ECF No. 122-5 at 801), but by Q4 2020, noted the Freedom Funds "had strong performance relative to their peer group." (Hill Decl., Ex. 86, ECF No. 122-5 at 828).

6

### ii. Invesco Funds

The Invesco Fund is "an actively managed mutual fund positioned primarily in real estate instruments." (DSOF ¶ 115; PSOF ¶ 115). In March 2017, the IC placed the Invesco Fund on Watch. (DSOF ¶ 124; PSOF ¶ 124). Notwithstanding placement on Watch, Mercer continued recommending retention of the Invesco Fund. (DSOF ¶ 125; PSOF ¶ 124). On June 26, 2017, the IC met with Invesco representatives who presented on "global real estate funds and engaged with IC members, as well as Mercer, regarding the Invesco Fund's performance." (DSOF ¶¶ 126-27; PSOF ¶ 124). The IC subsequently decided to conduct a search for potential alternatives. (DSOF ¶ 128; PSOF ¶ 128). It was not until Q4 2020 that Mercer suggested, for the first time, to remove the Invesco Fund. (DSOF ¶ 132; PSOF ¶ 132). In July 2021, the IC removed the Invesco Fund from the Plan. (DSOF ¶ 132-33; PSOF ¶ 132-33).

### E. Procedural History

Defendants previously moved to dismiss the Complaint, which this Court denied on May 4, 2021. (ECF No. 41). On July 28, 2023, Plaintiffs filed the pending motion to certify the putative class (ECF No. 107), which Defendants opposed (ECF No. 108), to which Plaintiffs replied. (ECF No. 111). Thereafter, on September 19, 2023, Defendants filed a motion for summary judgment ("Defs.' Brief") (ECF No. 119), which Plaintiffs opposed ("Pls.' Opp'n") (ECF No. 136), to which Defendants replied ("Defs.' Reply") (ECF No. 138). On September 19, 2023, Defendants also filed a motion to exclude the opinions and testimony of Martin Dirks, Plaintiffs' expert who opined on the loss suffered by the Plan (ECF No. 116), which Plaintiffs opposed (ECF No. 134), to which Defendants replied (ECF No. 137). On September 19, 2023, Plaintiffs filed a motion to exclude the opinions and testimony of Jonathan Reuter, Defendants' expert who opined on the objective prudence of the Challenged Funds (ECF No. 124), which Defendants opposed (ECF No. 133), to

which Plaintiffs replied (ECF No. 141).  This matter is now ripe for consideration.[9]

## II. LEGAL STANDARD

Summary judgment is appropriate when there "is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  A factual dispute is genuine "if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party[;]" and "is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citation omitted).  The moving party bears the "initial responsibility" of demonstrating the "absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The nonmoving party "must [then] counter with specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citation omitted).  There can be "no genuine [dispute] as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23.

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence. . . ." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citation omitted).  Rather, "[a]ll facts and inferences are construed in the light most favorable to the non-moving party." *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citation omitted).  And credibility determinations are the province of the factfinder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).  Thus, the court's role is "to determine whether there is a genuine [dispute] for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

---

[9] The Court has also considered the parties' respective notices of supplemental authority and responses thereto that were filed pertaining to the pending motions.

### III. DISCUSSION

"ERISA is . . . a 'comprehensive and reticulated statute,' the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 251 (1993) (quoting *Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 361 (1980)). As the Third Circuit has expressed, "ERISA nowhere mandates the institution of a pension program or the right to a pension. ERISA is not a direction to employers as to what benefits to grant their employees. Rather, ERISA is concerned with the *administration* of an established plan and its elements." *Hlinka v. Bethlehem Steel Corp.*, 863 F.2d 279, 283 (3d Cir. 1988).

"The elements of an ERISA breach of fiduciary duty claim are: '(1) a plan fiduciary (2) breaches an ERISA-imposed duty (3) causing a loss to the plan.'" *Mator v. Wesco Distribution, Inc.*, 102 F.4th 172, 184 (3d Cir. 2024) (quoting *Sweda v. Univ. of Penn.*, 923 F.3d 320, 328 (3d Cir. 2019)). The parties do not dispute whether there is a plan fiduciary. Rather, the dispute focuses on whether an ERISA-imposed duty was breached and whether that breach resulted in loss to Plaintiffs.

#### A. Duty of Prudence (Count I)

The parties dispute whether Defendants breached their duty of prudence by failing to adequately monitor and manage the Challenged Funds. (*See* Defs.' Br. at 14-28; Pls.' Opp'n 15-29). As Plaintiffs have failed to raise a triable issue of fact as to whether Defendants engaged in a prudent process in reaching their investment decisions, the Court finds Plaintiffs' breach of fiduciary claim fails and Count I will be dismissed with prejudice.[10]

---

[10] As the Court finds Defendants are entitled to summary judgment, it need not address Plaintiffs' motion for class certification. Accordingly, the motion is **DENIED as moot**. (ECF No. 107).

ERISA mandates fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). "This duty of prudence is objective, judged by the information available at the time of each investment decision—not by the glow of hindsight." *Pizzaro v. Home Depot, Inc.*, 111 F.4th 1165, 1173 (11th Cir. 2024) (citing *Sacerdote v. New York Univ.*, 9 F.4th 95, 107 (2d Cir. 2021)). To prevail in a duty-of-prudence case under ERISA, a plaintiff must demonstrate that a plan fiduciary failed to both (1) engage in objectively prudent conduct "in arriving at [its] investment decision[s]," and (2) make decisions that "led to objectively prudent investments." *Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011) (internal quotation marks omitted).

In assessing this duty, courts look at a fiduciary's "process rather than results," considering "'whether a fiduciary employed the appropriate methods to investigate and determine the merits of a particular statement.'" *Sweda*, 923 F.3d at 329 (quoting *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996)). Such inquiry must evaluate the circumstances present at the time the fiduciary acted. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 177 (2022); *see also McCaffree Fin. Corp. v. ADP, Inc.*, No. 20-5492, 2023 WL 2728787, at *13 (D.N.J. Mar. 31, 2023) ("Hindsight indeed is 20/20, so the focus must be on the fiduciary's conduct in arriving at a decision") (internal citations omitted); *Falberg v. Goldman Sachs Grp., Inc.*, No. 19-9910, 2022 WL 4280634, at *11 (S.D.N.Y. Sept. 14, 2022) ("[T]he central question is whether a prudent fiduciary in like circumstances would have acted differently." (internal quotation marks omitted)), *aff'd*, No. 22-2689, 2024 WL 619297 (2d Cir. Feb. 14, 2024).

10

### i. The IC's Process

Defendants argue the IC's process for monitoring the Challenged Investments was prudent because they "scrupulously evaluated the Challenged Funds in lock-step coordination with the Plan's investor advisor (Mercer), commissioned targeted analyses of the Challenged Funds throughout the Relevant Period, and made changes to the Plan's investment lineup as market conditions evolved." (Defs.' Br. at 14-23). In opposition, Plaintiffs contend they have set forth "abundant evidence" that the IC's monitoring process was insufficient. (Pls.' Opp'n at 16-26). The Court disagrees and finds the IC's process for monitoring and managing the investments was diligent.

In *Silva v. Evonik Corp.*, No. 20-02202, 2024 WL 3379067, at *5 (D.N.J. June 28, 2024), the court found the investment committee's process for monitoring investments was "diligent" because the committee had engaged an investment advisor that, prior to quarterly meetings, "prepared and distributed reports containing information on Plan investments' asset allocations, fees, and performance against industry benchmarks." The reports also contained, "among other things, a watchlist that assigned investment option ratings, including those to 'watch,' 'discuss,' or 'terminate' at [investment committee] meetings, and undisputed evidence shows that the committee discussed such investments, even having an off-cycle meeting to discuss the [investment advisor's] recommendation to remove a fund." *Id.*

Likewise, in *Nunez v. B. Braun Medical, Inc.*, No. 20-4195, 2023 WL 5339620, at *8, *12 (E.D. Pa. Aug. 18, 2023), the court found the investment committee engaged in prudent conduct in relation to its choice of investment options for the plan because (i) "the Committee met regularly, at least annually since 2014 and at least quarterly since 2019[;]" (ii) "[t]he Committee relied upon not only its own assessments, but the advice of third-party consultants when monitoring investment

11

performance, reviewing detailed monthly and quarterly reports prepared by [its investment advisors] that analyzed the performance of the Plan's investment options and the market generally[;]" (iii) "[t]he Committee also used a watchlist to more heavily scrutinize underperforming investments and would vote to remove funds from the Plan's lineup that continually underperformed." *See also Falberg*, 2024 WL 619297, at *3 (affirming summary judgment where undisputed evidence revealed that "[t]he Committee's independent advisor continually monitored and evaluated the [p]lan's investment options, and provided the Committee members with detailed information, including monthly and quarterly performance reports" and where "Committee members reviewed those reports prior to attending Committee meetings").

Here, the Court finds Defendants have set forth sufficient evidence that the IC engaged in conduct comparable to the fiduciaries in *Silva*, *Nunez*, and *Falberg*. The following facts are undisputed: (i) the IC engaged Mercer[11] to provide investment advice (DSOF ¶¶ 23-24; PSOF ¶¶ 23-24); (ii) the IC met on a quarterly basis to review the Challenged Funds (DSOF ¶¶ 40-41; PSOF ¶¶ 40-41); and (iii) prior to the meetings, Mercer prepared and circulated quarterly Mercer Reports that contained, among other things, investment returns of the Challenged Funds on one-year, three-year, five-year, and ten-year bases, funds placed on "Watch," and an overview and analysis of external market activity, economic indicators, and regulatory and legislative updates relevant to the Plan's investments. (DSOF ¶¶ 43-44; PSOF ¶¶ 43-44).[12] Furthermore, the IC "received annual fiduciary trainings about their fiduciary obligations that covered, among other things, the 'issues

---

[11] The IC later retained AON Investment Consulting to provide these services. (DSOF ¶ 24; PSOF ¶ 24).
[12] Notably, the ERISA duty of prudence does not expect that fiduciaries "duplicate their advisers' investigative efforts" and instead requires that they "review the data a consultant gathers, to assess its significance and to supplement it where necessary." *In re Unisys*, 74 F.3d at 435. In fact, appointing an investment advisor is evidence of "thorough investigation" and "procedural and proper monitoring." *Cunningham v. Cornell Univ.*, No. 16-6525, 2019 WL 4735876, at *13 (S.D.N.Y. Sept. 27, 2019) (internal quotation marks omitted).

12

they needed to consider while selecting, monitoring, and changing managers of investments in the plan.'"  (DSOF ¶ 55; PSOF ¶ 55).

Plaintiffs urge this Court to find *Nunez* and *Falberg* distinguishable from the present action because of "the lack of engagement of the Committee" and argue "there is no evidence of independent scrutiny or any follow-up by the Committee when presented with sustained underperformance of the Challenged Instruments."  (Pls.' Opp'n at 18-19).  The Court disagrees.  The undisputed record evidence shows "the IC proactively commissioned Mercer to undertake targeted analyses of the Plan's investments, including searches for alternative funds as well as reviews of existing ones, and administered Requests for Proposals to solicit proposals from service providers."  (DSOF ¶ 48; PSOF ¶ 48).  Additionally, the IC took follow-up measures regarding both the Freedom Funds and the Invesco Fund.  (DSOF ¶¶ 83-90, 126-128; PSOF ¶¶ 83-90, 126-128).  Given the thoroughness of Mercer's reports and the frequency of the IC meetings, the Court is satisfied that the IC had a prudent process with respect to investments.

### ii. The Meeting Minutes

The Court likewise rejects Plaintiffs' argument that a genuine dispute of material fact exists because the IC's "meeting minutes fail to capture any meaningful discussion of the years of consistent underperformance of the Challenged Investments during the Class Period." (Pls.' Opp'n at 17-18).  The *Falberg* Court rejected similar argument and noted "there is no requirement that meeting minutes need to be a verbatim transcript of all the issues considered by fiduciaries." 2022 WL 4280634, at *12.  Rather, the court expressed:

> That the meeting minutes do not reflect a particular level of detail with respect to these discussions—of the funds and their performance, as well as alternatives—does not mean the discussions did not happen, nor is it enough to suggest that the Committee's consideration of its investment options, both during and outside its regular meetings, was not sufficiently "deliberative" or was otherwise imprudent.

*Id.* at *13; *see also Sellers v. Trustees of Boston Coll.*, No. 22-10912, 2024 WL 1586755, at *20 n.25 (D. Mass. Apr. 11, 2024) (rejecting the plaintiffs' argument that "the meeting minutes' lack of detail shows a lack of discussion"). The record evidence reveals at the conclusion of the quarterly meetings, the IC's secretary prepared meeting minutes that outlined attendees, approval of previous meeting minutes, updates, reviews of respective funds, and, in some minutes, updates on litigations, investment trends, and regulations. (Hill Decl., Exs. 16-43, ECF No. 122-1). Notably, Plaintiffs' expert Driscoll also testified the Mercer reports were "part of the documentary record of the [C]ommittee's process." (Hill Reply Decl., Ex. 138, ECF No. 140-3 at 127:9-12). Further, as Defendants point out, Plaintiffs fail to cite a *single* case that sustained a claim for breach of the duty of prudence on the basis that a committee's minutes were insufficiently descriptive. *See Falberg*, 2022 WL 4280634, at *12. As such, the Court finds the meeting minutes do not fail to demonstrate a meaningful discussion regarding the Challenged Funds.

### iii. The Investment Policy Statement

Plaintiffs also assert that the IC's failure to adhere to the IPS presents genuine issues of fact precluding a finding that the IC acted with the requisite prudence. (Pls.' Opp'n at 26-28). Plaintiffs' contention is based on the testimony of their process expert, Driscoll, who contended that, based on her view of the IPS, the IC failed to remove the Challenged Funds at the appropriate time. Driscoll opines the IC should have removed the Freedom Funds no later than June 2015, and the Invesco Funds no later than June 2016, after the Challenged Funds short-term performance, and its failure to do so rendered it procedurally imprudent. (Hill Decl., Ex. 86, ECF No. 122-6 at 872-75). The Court disagrees.

Plan fiduciaries are required to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with [ERISA]." 29

14

U.S.C. § 1104(a)(1)(D). The IPS "establish[es] guidelines" for the IC to consider when evaluating investment assets and outlines factors for the IC to consider when selecting and monitoring investments. (Hill Dec., Ex. 80, ECF No. 122-6 at 568-69). One of the factors outlined in the IPS is performance, but the IPS expressly notes "[n]o single factor will determine whether an investment option should be added, retained, or eliminated[.]" (Hill Decl., Ex. 80, ECF No. 122-6 at 568). The Court finds the IC's maintenance of the Challenged Funds, notwithstanding short-term performance issues, was not a failure to adhere to the IPS because performance was just one factor for the IC to consider.[13]

Further, Plaintiffs urge this Court to find a genuine dispute of material fact exists because Quest revised the IPS. Specifically, after the initiation of this action, Quest removed language pertaining to watch list and termination criteria, along with language stating that "a three year-year period is generally sufficient for evaluating performance." (Pls.' Opp'n at 28). The Court rejects this argument as the IPS's plain language expressly provides "[i]t will be adapted over time to reflect economic, market and program changes." (Hill Decl., Ex. 80, ECF No. 122-6 at 564). As such, the Court finds the IPS expressly permits and recognizes changes may be made to the IPS over time.

### iv. The Challenged Funds

Moreover, Plaintiffs assert there is a genuine dispute of material fact as to whether the Freedom Funds and Invesco Funds – which constantly underperformed – were adequately managed and monitored. (Pls.' Opp'n at 20-26). The Court disagrees.

As discussed *supra*, the IC utilized a prudent process by engaging Mercer to provide

---

[13] The Court notes Driscoll subsequently testified that the IC did not need to take "immediate action" regarding the Challenged Funds but needed to start "probing further and start understanding the reasons for the underperformance" and "be prepared to take immediate action if the issues continued." (Hill Decl., Ex. 90, ECF No. 122-6 at 88:15-89:13). As the Court discusses *infra*, the record evidence demonstrates the IC engaged in this conduct.

15

investment advice, meeting on a quarterly basis to review the Challenged Funds, and receiving, prior to the meetings, the quarterly Mercer Reports.  (DSOF ¶¶ 23-24, 40-41, 43-44; PSOF ¶¶ 23-24, 40-41, 43-44).

The Court finds the undisputed evidence shows the IC closely monitored the performance of the Freedom Funds during the Relevant Period.  For example, during a December 9, 2015 IC meeting, the IC met with Fidelity and was provided with information about Fidelity's management strategy for the Freedom Funds.  (Hill Decl., Ex. 21, ECF No. 122-1 at 562).  On July 11, 2016, Mercer met Fidelity Investments for an update on Freedom Funds and subsequently upgraded its rating from B to B+.  (Hill Decl., Ex. 51, ECF No. 122-3 at 160-61).  The IC also directed Mercer to conduct ad hoc analyses of the Freedom Funds, focusing on their performance versus alternative options and their glide path.  (DSOF ¶ 82; PSOF ¶ 82).  In October 2016, Mercer presented a "glide path analysis" whereby it evaluated the Freedom Funds' "asset allocation strategy" and concluded it was a "good fit."  (DSOF ¶ 86; PSOF ¶ 86). Additionally, in 2016, Mercer recommended the continued maintenance of the Freedom Funds.  (DSOF ¶ 87; PSOF ¶ 87).

Additionally, in Q4 2019, Mercer recommended that the IC "decide whether to continue offering participants actively managed target funds or to change to passively managed target funds."  (Hill Decl., Ex. 98, ECF No. 122-7 at 196).  The IC appointed Mercer "to assist in the evaluation and selection of an index target-date funder manager to possibly replace the actively managed Fidelity Freedom Funds." (Hill Decl., Ex. 99, ECF No. 122-7 at 198).  Mercer subsequently prepared a "Manager Search Report" that compared the Freedom Funds with four passively managed target-date funds and did not recommend the IC choose any of the alternatives.  (DSOF ¶¶ 90-91; PSOF ¶¶ 90-91).  Throughout 2020 and 2021, the IC continued to "scrutinize" the Freedom Funds.  (DSOF ¶ 93; PSOF ¶ 93).  Notably, while Mercer recommended placing the

Freedom Funds on Watch in Q1 through Q3 2020, (Shah Decl., Ex. 5, ECF No. 135-5 at 8; Hill Decl., Ex. 66, ECF No. 122-5 at 673, Hill Decl., Ex. 67, ECF No. 122-5 at 801), by Q4 2020, Mercer noted the Freedom Funds "had strong performance relative to their peer group." (Hill Decl., Ex. 86, ECF No. 122-5 at 828). As such, the Court finds the undisputed evidence reveals the IC maintained a prudent process of monitoring and reviewing the Freedom Funds.

The Court also finds the undisputed evidence reveals the IC closely monitored and reviewed the performance of the Invesco Fund during the time it was an investment option under the Plan. For instance, in March 2017, the IC placed the Invesco Fund on Watch. (DSOF ¶ 124; PSOF ¶ 124). Notwithstanding placement on Watch, Mercer continued recommending retention of the Invesco Fund. (DSOF ¶ 125; PSOF ¶ 124). On June 26, 2017, the IC met with Invesco representatives who presented on "global real estate funds and engaged with IC members, as well as Mercer, regarding the Invesco Fund's performance." (DSOF ¶¶ 126-27; PSOF ¶ 124). The IC subsequently decided to conduct a search for potential alternatives. (DSOF ¶ 128; PSOF ¶ 128). It was not until Q4 2020 that Mercer suggested, for the first time, to remove the Invesco Fund, which the IC subsequently removed from the Plan in July 2021. (DSOF ¶¶ 132-33; PSOF ¶¶ 132-33). *See In re Prime Healthcare ERISA Litig.*, No. 8:20-cv-1529, 2024 WL 3903232, at *20 (C.D. Cal. Aug. 22, 2024) (finding the committee "closely monitored and reviewed the performance of the Invesco Fund" where its third-party investment consultant flagged the fund's recent underperformance and recommended consideration of alternative funds, and the committee ultimately replaced the fund "following a comprehensive review").

Beyond the process utilized by the IC, the Court rejects Plaintiffs' argument that the Freedom Funds and Invesco Funds benchmark performances present a triable issue of fact. First, Plaintiffs' assertion that the Freedom Funds and Invesco Funds fell short of their benchmarks does

17

not indicate that a prudent fiduciary, even knowing of the underperformance, would have removed the funds sooner. *See Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006) ("[I]nvestment losses are not proof that an investor violated his duty of care." (citing *DeBruyne v. Equitable Life Assurance Soc. of the United States*, 920 F.2d 457, 465 (7th Cir. 1990))); *see also White v. Chevron Corp.*, No. 16-cv-0793, 2016 WL 4502808, at *17 (N.D. Cal. Aug. 29, 2016) ("Indeed, a fiduciary may – and often does – retain investments through a period of underperformance as part of a long-range investment strategy."); *Cunningham*, 2019 WL 4735876, at *11 ("Long-term investment options, like those offered in a retirement plan, may have varying levels of performance over the course of time.").

Additionally, at times, the Freedom Funds outperformed the majority of Morningstar peer funds, and the Invesco Fund exceeded the terms of its prospectus benchmark "exceeded the returns of its prospectus benchmark in five of the eight years of the Relevant Period." (DSOF ¶ 137; PSOF ¶ 137). *See Silva*, 2024 WL 3379067, at *6 ("Any discrepancy in benchmark performance cannot, on its own, support a finding of prudence."); *Smith*, 37 F.4th at 1167 (finding that while "an after-the-fact performance gap between benchmark comparators . . . may offer a building block for a claim of imprudence" it does not "by itself violate[ ] the process-driven duties imposed on ERISA fund managers").

The Court therefore grants summary judgment as to the IC's monitoring and maintenance of the Challenged Funds.[14] Because there is no breach of duty, the Court need not consider whether Plaintiffs sustained any loss.[15]

---

[14] As the Court finds there is ample evidence in the record to demonstrate the IC engaged in a prudent process, the Court need not consider whether the funds are objectively prudent. *See Renfro*, 671 F.3d at 322. As such, Plaintiffs' motion to exclude the opinions and testimony of Jonathan Reuter, Defendants' expert who opined on the objective prudence of the Challenged Funds, is **DENIED as moot**. (ECF No. 124).

[15] Since the Court finds there is no breach of a fiduciary duty, the Court need not address Defendants' motion to exclude the opinions and testimony of Martin Dirks, Plaintiffs' expert who opined on the loss suffered by the Plan. Accordingly, Defendants' motion is **DENIED as moot**. (ECF No. 119).

### B. Failure to Monitor Fiduciaries and Co-Fiduciary Breaches (Count II)

Plaintiffs also assert that "Quest and the Committees" breached their duty to monitor the IC work with respect to the Plan. (*See* Compl. ¶ 90). But Plaintiffs "'cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA.'" *In re Allergan ERISA Litig.*, Master File No. 17-1554, 2018 WL 8415676, at *7 (D.N.J. July 2, 2018) (quoting *Rinehart v. Lehman Bros. Holdings Inc.*, 817 F.3d 56, 68 (2d Cir. 2016)). As such, the Court grants summary judgment as to Plaintiffs' derivative claim for breach of the duty to monitor and dismisses Count II with prejudice.

### C. Breach of Trust (Count III)

Finally, Plaintiffs allege, in the alternative, that Defendants committed a breach of trust "by permitting the Plan to offer a menu of poor and expensive investment options that cannot be justified in light of the size of the Plan and other expenses of the Plan." (*See* Compl. ¶ 96). As the court recently elucidated in *McCaffree Financial Corp.*,

> A claim for breach of trust is "generally interchangeable with breach of fiduciary duty[,]" except that it can be asserted against non-fiduciaries. *Johnson* [*v. PNC Fin. Servs. Grp.. Inc.*], [No. 2:20-cv-01493,] 2022 WL 973581, at *8 [(W.D. Pa. Mar. 31, 2022)] (internal quotations and citation omitted). "Courts have generally failed to see any distinction when evaluating breach-of-trust claims versus breach-of-fiduciary-duty claims other than the fiduciary-versus-non-fiduciary consideration." *Id.* (citing *In re Omnicom ERISA Litigation*, No. 20-4141, 2021 WL 3292487, at *17 (S.D.N.Y. Aug. 2, 2021)). Thus, the same analysis applies to a fiduciary duty and breach-of-trust claim. *Id.*

2023 WL 272287/87, at *18 n.16. As the Court has found there is no breach of fiduciary duty, the Court will also grant summary judgment as to Plaintiffs' breach of trust claim and dismiss Count III with prejudice.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment (ECF No. 119) is **GRANTED**, and Plaintiffs' Consolidated Complaint (ECF No. 10) is **DISMISSED with prejudice**. Additionally, Plaintiffs' motions for class certification (ECF No. 107) and to exclude the opinions and testimony of Jonathan Reuter (ECF No. 124), and Defendants' motion to exclude the opinions and testimony of Martin Dirks (ECF No. 116) are **DENIED as moot**. The Clerk of Court shall **CLOSE** this matter.

An appropriate Order accompanies this Opinion.

DATED: 9/25/2024

_____
HONORABLE JULIEN XAVIER NEALS
United States District Judge